# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| CLETUS WOODROW AND BEVERLY ANN BOHON,<br>6210 Yellow Finch Lane<br>Elliston, Virginia 24087<br><br>WENDELL WRAY AND MARY MCNEIL FLORA,<br>150 Floradale Farms Lane<br>Boones Mill, Virginia 24065<br><br>and<br><br>ROBERT MATTHEW AND AIMEE CHASE HAMM,<br>10420 Mill Creek Road<br>Bent Mountain, Virginia 24059<br><br>       *Plaintiffs*,<br><br>v.<br><br>FEDERAL ENERGY REGULATORY COMMISSION<br>**Serve:**<br>888 First Street, NE<br>Washington, DC 20426<br>and<br>NEIL CHATTERJEE<br>in his official capacity as Chairman of the Federal Energy Regulatory Commission,<br>**Serve:**<br>888 First Street, NE<br>Washington, DC 20426<br><br>and<br>MOUNTAIN VALLEY PIPELINE, LLC<br>**Serve:**<br>Registered Agent:<br>CT CORPORATION SYSTEM<br>4701 Cox Rd Ste 285<br>Glen Allen, VA, 23060 – 6808<br>       *Defendants*. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | Case No. _____ |

## COMPLAINT

**COME NOW** the Plaintiffs, Cletus Woodrow and Beverly Ann Bohon (the "Bohons"), Wendell Wray and Mary McNeil Flora (the "Floras"), and Robert Matthew and Aimee Chase Hamm (the "Hamms"), by counsel, and file this Complaint against the Defendants, the Federal Energy Regulatory Commission ("FERC") and Mountain Valley Pipeline, LLC ("MVP"). In support thereof, the Plaintiffs allege as follows:

### PARTIES

1.      The Bohons are residents of Montgomery County, Virginia, and own two tracts of land sought by MVP (Montgomery County Tax Map Parcel No. 030271 and MVP Parcel No. VA-MN-5233, and Montgomery County Tax Map Parcel No. 017761 and MVP Parcel No. VA-MO-022). MVP seeks to take approximately 0.19 and 2.74 acres of land in Elliston, VA, owned by the Bohons for the MVP pipeline project. The property is at the base of Poor Mountain. Cletus, a bluegrass musician, lives on Yellow Finch Lane with his wife, Beverly. The property contains springs that water vegetable gardens and a weeping cherry tree, affectionately known as "Miss Magnificent," a memorial to Cletus' late father. The MVP project will bisect the Bohons' property and cause damage. Because the Bohons have refused to willingly sell their property interests by contract, MVP seeks to exercise its power of eminent domain under the NGA.

2.      The Floras are residents of Franklin County, Virginia (Tax Map Parcel No. 0380002000 and MVP Parcel No. VA-FR-017.21). Wendell Wray, a retired Franklin County Sheriff's Deputy, and Mary McNeil, a retired Roanoke County schoolteacher, live on a fourth generation family farm. Wendell has lived on this land his entire life, and Wendell and Mary have lived there together as a married couple for over 40 years. The old family farmhouse and outbuildings, as well as the Floras' ranch home are situated downstream from the pipeline. The

farm is approximately 53 acres. MVP seeks to take 5.88 acres of land for its pipeline project. MVP's taking has caused and will continue to cause damage to the Floras' land. Because the Floras have refused to sell their property interests to MVP, MVP seeks to take the land by exercising its power of eminent domain under the NGA.

3.     The Hamms are residents of Roanoke County, Virginia, and own 7.852 acres of land on Bent Mountain (Tax Map No. 110.00-1-56.1 and described in deed recorded as Instrument No. 200405721). The Hamms maintain their custom-built family home on the secluded land, which they share with seven horses, six dogs, and several children. MVP seeks to take an access easement of 0.15 acres via eminent domain proceedings in federal court. This easement will cause damage to the Hamms' land and involve transformation of the property, including excavation and widening of the road. The Hamms have refused to willingly sell their property interests by contract to MVP and MVP therefore seeks to take the land by exercising its power of eminent domain under the NGA.

4.     Defendant FERC is a federal agency that regulates the interstate transmission of electricity, natural gas, and oil. FERC also reviews proposals to build liquefied natural gas terminals and interstate natural gas pipelines and grants certificates of convenience and public necessity to applicants it deems qualified to develop such projects. FERC is headquartered at 888 First Street, N.E., Washington, D.C. 20426. FERC's Chairman, Neil Chatterjee, performs his official duties at FERC's headquarters in Washington, D.C.

5.     Defendant MVP is a limited liability company duly organized and existing under the laws of the State of Delaware.  MVP is a joint venture between affiliates of EQT Midstream Partners, LP; NextEra Energy US Gas Assets, LLC; WGL Midstream, Inc.; Vega Midstream MVP LLC; and RGC Midstream, LLC. MVP is authorized to conduct business in the Commonwealth

of Virginia. MVP's principal office is located at 625 Liberty Avenue, Suite 1700, Pittsburgh, Pennsylvania 15222-3111.

## JURISDICTION AND VENUE

6.      Under 28 U.S.C. §1331, this Court has subject matter jurisdiction over this action because it arises under federal law—namely, Articles I, II, and III of the Constitution of the United States, the non-delegation doctrine, the separation of powers doctrine, and 15 U.S.C. § 717 *et seq*., the Natural Gas Act of 1938 ("NGA").

7.      Under 28 U.S.C. § 1391, venue is proper because a substantial part of the events or omissions giving rise to the claim occurred in this district, Director Chatterjee of FERC performs his official duties in this district, and both defendants are subject to the court's personal jurisdiction with respect to the actions raised herein.

8.      In addition, while actions challenging *agency* decisions must be appealed within the agency until all available remedies therein are exhausted, actions centering wholly on the constitutionality of *Congress's* actions and Congressional legislation may only be brought in federal district court. *Delaware Riverkeepers Network v. FERC*, 895 F.3d 102, 107 (D.C. Cir. 2018); *NO Gas Pipeline v. FERC*, 756 F.3d 764 (D.C. Cir. 2014).

## STATEMENT OF FACTS

9.      Congress, a *legislative* body of the federal government sitting in Washington, D.C., passed the NGA in 1938.

10.     In 1947, Congress amended the NGA to enable "the Commission"[1] to issue a

---

[1] The "Commission" refers to the Federal Energy Regulatory Commission ("FERC"), which is the successor to the Federal Power Commission.

"certificate of public convenience and necessity to a natural-gas company for the transportation in interstate commerce of natural gas." 15 U.S.C. § 717f.

11.     Under the NGA, the recipient of a certificate of public convenience and necessity ("holder") also acquires the right of eminent domain. 15 U.S.C. § 717f(h).

### FERC's Creation as An Arm of the Executive Branch

12.     FERC, a federal agency, is an arm of the *executive* branch of the federal government composed of "up to five commissioners who are appointed by the President of the United States with the advice and consent of the Senate."

13.     As FERC's commissioners are unelected, FERC is an unelected regulatory body.

14.     Article I of the United States Constitution vests all legislative powers in Congress.  Thus, only the legislative branch of government can create laws. Because FERC is not part of the legislative branch, FERC has no authority to create law.

### Congress's Delegation of Power to FERC Via The NGA

15.     In passing the NGA, Congress delegated to FERC massive authority to exercise legislative power to determine when the right of eminent domain should be conveyed to an applicant without drafting legislation to guide FERC in carrying out Congress's will.

16.     Instead, Congress deferred entirely to FERC, allowing the agency to unilaterally create and impose its own standards, tests, and rules for determining who can sell or transport natural gas, how much they can charge for their products and services, and to whom they can sell them.

17.     For example,

a.     Under 15 U.S.C. § 717b(a), no entity may import or export natural gas without first obtaining FERC's permission.  FERC is unilaterally empowered to determine

5

whether doing so would be "consistent with the public interest" and to impose conditions for approval that FERC "find[s] necessary or appropriate."

b.      Under 15 U.S.C. § 717c(a), FERC is empowered to declare unlawful any rate or regulation affecting rates that FERC determines are not "just and reasonable." Congress provides no criteria in the NGA to guide FERC in determining what rates are "just and reasonable."

c.      Under 15 U.S.C. § 717d(a), FERC may order a natural-gas company to change the rate it charges for transporting or selling natural gas if FERC determines that the rate is "unjust, unreasonable, unduly discriminatory, or preferential …."

d.      Under 15 U.S.C. § 717f(a), FERC may order a natural-gas company to "extend or improve its transportation facilities," connect those facilities with those of other natural-gas distributors, and sell natural gas to those natural-gas distributors if FERC unilaterally determines that "no undue burden will be placed upon such natural-gas company thereby" and that complying with FERC's orders would not "impair [the natural-gas company's] ability to render adequate service to its customers." Again, Congress provided no criteria by which FERC should evaluate what constitutes an "undue burden" or "adequate service."

18.      Most significantly here, 15 U.S.C. § 717f(e) delegates to FERC Congress's legislative powers by empowering FERC to issue "certificates of public convenience and necessity" to entities wishing to construct or extend natural-gas facilities. As discussed, *infra*, these certificates are used by natural-gas companies to exercise eminent domain authority under 15 U.S.C. § 717f(h).

19.      Congress did not provide FERC with any fixed standard or even an "intelligible

principle" to guide FERC in determining whether or under what conditions to grant a certificate to an applicant. Instead, Congress directed FERC to issue certificates to those applicants whom **_FERC_** determines are "qualified" and "able and willing … to perform the service proposed" and to obey FERC's rules so long as **_FERC_** determines that the proposed service "is or will be required by the present or future public convenience and necessity."

20.     Instead of defining what a "qualified" applicant looks like (i.e., "A qualified applicant shall meet hypothetical requirements *A, B,* and *C . . .* "), Congress stated that an applicant is "qualified" based on its willingness and ability to comply with "the requirements, rules, and regulations **of the Commission**" (as opposed to requirements or standards set forth by Congress). 15 U.S.C. § 717f(e) (emphasis added).

21.     **_FERC's_** test that it created to determine which applicant is "qualified" to receive a certificate is outlined in FERC's "Statement of Policy." *See* **Exhibit A**.

22.     FERC created this test without any guidance from Congress. Congress, in other words, provided FERC with no test or fixed standards to guide FERC in developing its criteria for deciding which applicants are qualified to exercise the inherently coercive power of eminent domain.

**The Delegation of Eminent Domain Power to Private Entities Such As MVP**

23.     An applicant who meets FERC's internally designed tests for public convenience and necessity obtains from FERC a Certificate, which conveys the power of eminent domain to the applicant as follows:

> **When any holder of a certificate of public convenience and necessity cannot acquire by contract, or is unable to agree with the owner of property to the compensation to be paid for, the necessary right-of-way to construct**, operate, and maintain a pipe line or pipe lines for the transportation of natural gas, and the necessary land or other property, in addition to right-of-way, for the location of compressor stations, pressure apparatus, or other stations or equipment necessary

to the proper operation of such pipe line or pipe lines, **it may acquire the same by the exercise of the right of eminent domain** in the district court of the United States for the district in which such property may be located, or in the State courts. The practice and procedure in any action or proceeding for that purpose in the district court of the United States shall conform as nearly as may be with the practice and procedure in similar action or proceeding in the courts of the State where the property is situated: Provided, That the United States district courts shall only have jurisdiction of cases when the amount claimed by the owner of the property to be condemned exceeds $3,000.

15 U.S.C. § 717f(h) (emphasis added).

24.     Thus, in situations where landowners refuse to sell their property interests to certificate holders, the NGA empowers such holders to forcibly "take" the landowners' property against their will through eminent domain proceedings in federal court, even in circumstances where, as here, the taking is for private gain.

25.     Eminent domain power is traditionally an inherently coercive governmental power by which the sovereign forcibly seizes or "takes" private property without the landowner's consent for the sake of the "public good" (i.e., "public use").

26.     Eminent domain power is a legislative power.

27.     MVP applied for and obtained a Certificate of Public Convenience and Necessity from FERC. FERC issued the Order on October 13, 2017, permitting MVP to construct, maintain, and operate a natural gas pipeline along a route selected by MVP.

28.     The Plaintiffs own property along that route and are unwilling to convey their property interests to MVP.

29.     Because MVP has not been able to convince the Plaintiffs to convey their property interests willingly by contract, MVP has filed actions seeking to exercise its unlawfully delegated "right" of eminent domain to forcibly take the Plaintiffs' property against their wishes.

30.     On October 24, 2017, MVP filed an action to condemn an easement along the approved route under section 7 of the NGA. While the route has gone through several changes since the initial proposal and certification, the pipeline's planned construction, operation, and maintenance impacts the property interests of all the Plaintiffs.

## Revival of the Federal Non-Delegation Doctrine.

31.     The federal non-delegation doctrine has been dormant (but not dead) for 84 years.

32.     However, as recently as June 2019, the United States Supreme Court recognized that despite the rarity of its invocation to invalidate legislation, the non-delegation doctrine remains a valid principle of constitutional law on the federal level. *See Gundy v. United States*, 139 S. Ct. 2116, 2121 (2019) (where the plurality noted that "The nondelegation doctrine bars Congress from transferring its legislative power to another branch of Government.") (Kagan, J., joined by Ginsberg, J., Breyer, J., and Justice Sotomayor).

33.     The three-member dissent in *Gundy* also recognized the existence, validity, and importance of the non-delegation doctrine as follows:

> While it's been some time since the Court last held that a statute improperly delegated the legislative power to another branch—thanks in no small measure to the intelligible principle misadventure—the Court has hardly abandoned the business of policing improper legislative delegations. When one legal doctrine becomes unavailable to do its intended work, the hydraulic pressures of our constitutional system sometimes shift the responsibility to different doctrines. And that's exactly what's happened here. We still regularly rein in Congress's efforts to delegate legislative power; we just call what we're doing by different names.

*Id.* at 2141 (Gorsuch, J., dissenting, joined by Thomas, J. and Chief Justice Roberts).

34.     The non-delegation doctrine is derived from Articles I, II, and III of the United States Constitution, which establish and define the separation of powers between the three branches of government. *Id.* at 2123 ("Article I of the Constitution provides that '[a]ll legislative Powers herein granted shall be vested in a Congress of the United States.' §1. Accompanying that

assignment of power to Congress is a bar on its further delegation. Congress, this Court explained

early on, may not transfer to another branch 'powers which are strictly and exclusively legislative.'

*Wayman v. Southard,* 23 U.S. 1, 10 Wheat. 1, 42-43, 6 L. Ed. 253 (1825)").

35.     The non-delegation doctrine prohibits Congress from delegating power to an

executive agency without constitutionally adequate limitations or standards restricting the

delegation.

36.     The test currently used to determine whether the delegation is overly broad and

unconstitutional is the "intelligible principle" test. *Gundy,* 139 S. Ct. at 2123 ("The constitutional

question is whether Congress has supplied an intelligible principle to guide the delegee's use of

discretion. So the answer requires construing the challenged statute to figure out what task it

delegates and what instructions it provides.") (Kagan, J.).

37.     Three other Justices in *Gundy* also recognized the validity of the non-delegation

doctrine, but held that the intelligible principle standard was far too lenient.[2] That group of Justices

would instead impose stricter standards on Congressional delegations of power. *See Gundy*, 139

S. Ct. at 2135.

38.     Because the ninth Justice, Justice Kavanaugh, did not take part in the decision,

Justice Alito also applied the intelligible principle standard, but indicated a willingness to revisit

---

[2] *Id*. at 2139 (Gorsuch, J., dissenting)

    Still, it's undeniable that the "intelligible principle" remark eventually began to take
    on a life of its own. We sometimes chide people for treating judicial opinions as if
    they were statutes, divorcing a passing comment from its context, ignoring all that
    came before and after, and treating an isolated phrase as if it were controlling. But
    that seems to be exactly what happened here. For two decades, no one thought to
    invoke the "intelligible principle" comment as a basis to uphold a statute that would
    have failed more traditional separation-of-powers tests. In fact, the phrase sat more
    or less silently entombed until the late 1940s. Only then did lawyers begin digging
    it up in earnest and arguing to this Court that it had somehow displaced (*sub silentio*
    of course) all prior teachings in this area.

the issue in a future case with a full Court. *Id*. at 2131 ("If a majority of this Court were willing to reconsider the approach we have taken for the past 84 years, I would **support** that effort.") (Alito, J., concurring) (emphasis added).

39.     Justice Kavanaugh has since indicated that he would join Justice Alito and the *Gundy* dissent to form a majority to revisit the proper test to apply in non-delegation challenges. *Paul v. United States*, 589 U.S. __ (2019) (cert denied).

## COUNT I: FACIAL CONSTITUTIONAL CHALLENGE TO *CONGRESS'S* OVERLY BROAD DELEGATION OF LEGISLATIVE POWER TO FERC

40.     Plaintiffs repeat and re-allege paragraphs 1-39 of this Complaint as if fully set forth herein.

41.     The delegation of legislative power by Congress to FERC via 15 U.S.C. § 717f of the NGA was and is overly broad under Articles I, II, and III of the Constitution of the United States of America, the non-delegation doctrine, and the separation of powers doctrine derived therefrom.

42.     This delegation of power by Congress to FERC is facially unconstitutional because Congress did not provide sufficiently definite guidance to FERC to enable FERC to determine whether and how to grant certificates of public convenience and necessity to applicants.

43.     By delegating to FERC unchecked and unfettered discretion to determine whether to grant certificates of public convenience and necessity, Congress has unlawfully delegated to FERC the legislative power to create law without sufficient guidance, limitations, or criteria from Congress to ensure that FERC is doing Congress's will and not its own.

44.     The delegation of legislative power by Congress to FERC does not meet the intelligible principle test currently used to determine whether delegations of power to executive agencies are constitutional.

45.     Even if the delegation of power by Congress to FERC meets the intelligible principle test, that test is itself unconstitutional under Articles I, II, and III of the Constitution (separation of powers doctrine), which impose stricter standards on the scope of delegations to executive agencies.

46.     Instead of imposing its own criteria and congressional standards for determining which applicants are worthy of wielding such an inherently coercive power, Congress broadly delegated that legislative authority to FERC—an unaccountable, unelected executive agency— thus allowing Congress to distance itself from potential political uproar resulting from unpopular takings of private property.

47.     Because the delegation of legislative power by Congress to FERC via 15 U.S.C. § 717f of the NGA was and is overly broad and unconstitutional, FERC has no authority to create policies or tests to determine how and when to issue certificates to applicants seeking to invoke the power of eminent domain.  All such certificates already issued are void *ab initio*.

### COUNT II: FACIAL CONSTITUTIONAL CHALLENGE TO *FERC'S* SUB-DELEGATION OF EMINENT DOMAIN POWER TO PRIVATE ENTITIES, INCLUDING MVP

48.     Plaintiffs repeat and re-allege paragraphs 1-47 of this Complaint as if fully set forth herein.

49.     Counts II and III are pleaded in the alternative.

50.     15 U.S.C. § 717f(h) empowers FERC to delegate to private entities, such as MVP, Congress's power of eminent domain.

51.     This delegation of delegated powers to private entities violates the separation of powers and non-delegation doctrines and is therefore facially unconstitutional.  *J.W. Hampton, Jr.*

& *Co. v. United States*, 276 U.S. 394, 405-06 (1928) ("*Delegata potestas non potest delegari*," meaning "one to whom power is delegated cannot himself further delegate that power.").

52.     *Even if* the power of eminent domain were not legislative power, it would still be an inherently public power that cannot be sub-delegated to a private actor.

53.     Because all sub-delegations of eminent domain power by FERC via 15 U.S.C. § 717f(h) of the NGA are facially unconstitutional, FERC has no authority to issue certificates to applicants seeking to invoke the power of eminent domain and all such certificates already issued are void *ab initio*.

## COUNT III: FACIAL CONSTITUTIONAL CHALLENGE TO *CONGRESS'S* DELEGATION OF EMINENT DOMAIN POWER TO PRIVATE ENTITIES, INCLUDING MVP

54.     Plaintiffs repeat and re-allege paragraphs 1-47 of this Complaint as if fully set forth herein.

55.     Counts II and III are pleaded in the alternative.

56.     Pleading, in the alternative, that 15 U.S.C. § 717f delegates the public power of eminent domain ***directly*** from Congress to the applicant (i.e., from Congress directly to a private actor, such as MVP, as opposed to delegating it first to FERC and then to a private entity), such a direct delegation of eminent domain power by Congress to any private entity is facially unconstitutional.

57.     Eminent domain power is legislative power. *See, e.g*., I William Blackstone, *Commentaries on the Laws of England,* \*135.

58.     The delegation of legislative power by Congress to a private entity is facially unconstitutional. *See, e.g., DOT v. Ass'n of Am. R.R*., 575 U.S. 43, 62 (2015) ("When it comes to private entities, however, there is not even a fig leaf of constitutional justification. Private entities

are not vested with 'legislative Powers.' Art. I, §1. Nor are they vested with the 'executive Power,' Art. II, §1, cl. 1, which belongs to the President.") (Alito, J., concurring) (discussing the non-delegation doctrine's prohibition on delegations of governmental powers to private entities).

59.     The exercise of eminent domain power is particularly obnoxious when a private entity seeks to exercise that power for private gain.

60.     Eminent domain, by its very nature, is the forcible taking of private property by the sovereign—a process in which the individual's sacred right to property is sacrificed for the public good.

61.     The power of eminent domain is thus an inherently coercive, governmental power, much like the power to tax. It is a public power inherent to the sovereign and enforced by the power to seize land by force in the absence of the landowner's consent.

62.     Due to the very public nature of the power of eminent domain, it is inherently incompatible for it to be exercised by a private entity.

63.     Thus, *even if* the power of eminent domain were not legislative power, it would still be an inherently public, coercive governmental power that could not be delegated to a private actor.

64.     Congress's delegation of this inherently coercive and public power of eminent domain to any private actor violates the non-delegation doctrine and is therefore facially unconstitutional. All such certificates already issued to private actors are void *ab initio*.

**WHEREFORE**, the Plaintiffs respectfully pray that this Court enter a declaratory judgment in their favor against the Defendants declaring that Congress's overly broad delegation of legislative powers to FERC was and is facially unconstitutional; that any delegation of eminent domain power (whether via a sub-delegation from FERC or a direct delegation from Congress) to any and all private actors, including MVP, is facially unconstitutional; that FERC has no authority

to issue certificates to applicants seeking to invoke the power of eminent domain to take property; and that all such certificates already issued are void *ab initio;* further, that this Court enter an injunction preventing FERC from acting upon its delegated powers and issuing certificates and preventing certificate-holders from exercising the power of eminent domain using void certificates; as well as any other relief that this Court deems just and proper.

Respectfully submitted this 2nd day of January, 2020

CLETUS WOODROW AND BEVERLY ANN BOHON, WENDELL WRAY AND MARY MCNEIL FLORA, AND ROBERT MATTHEW AND AIMEE CHASE HAMM,

By:_____/s/ John R. Thomas, Jr._____
*Of Counsel*

John R. Thomas, Jr. (D.C. Bar No. 1027981)
**HAFEMANN MAGEE & THOMAS, LLC**
11 Franklin Road, SW
P.O. Box 8877
Roanoke, Virginia 24014
(540) 759-1660
jt@fed-lit.com

Mia Yugo (Pending Admission *Pro Hac Vice*)
(VSB No. 92975 & N.Y. Reg. No. 5530373)
**GENTRY LOCKE**
900 SunTrust Plaza
P.O. Box 40013
Roanoke, Virginia 24022-0013
(540) 983-9300
Fax: (540) 983-9400
yugo@gentrylocke.com
*Counsel for Plaintiffs*